BOTNA VALLEY STATE BANK, Appellant, v. A. M. GREIG et al., Appellees.

ATTACHMENT: Levy, Lien, Etc.—Prior Unrecorded Sale—Notice
—Pleading. An attaching creditor, in a contest with one claiming the personal property under a prior unrecorded sale which

has been attended with no act indicating a change of possession, need not allege that he had *no* notice of such prior sale; and, if he does make such allegation, he need not prove it.

ATTACHMENT:   Proceeding to Procure—Allegation of Fraudulent
2  Disposal—Effect as Confession of Notice.   An attaching creditor of personal property, in a contest with one claiming under a prior unrecorded contract of sale with the defendant in attachment, does not .confess that he had notice of such sale by the fact that, to obtain the attachment, said creditor made the statutory allegation that the defendant in attachment *"had disposed of his property with intent to defraud his creditors."*

CORPORATIONS:   Representation by Officers—Attachment—Knowl-
3  edge of Directors.   A corporation on whose behalf a petition in attachment is verified. by one of its directors is charged with whatever knowledge the director possesses with reference to matters bearing on the priority of the attachment lien.

FRAUDULENT CONVEYANCES:   Evidence—Unusual Nature of
4  Conveyances.   The unusual, indefinite, unreasonable, and contradictory manner in which a conveyance is alleged to have been consummated may necessarily carry such badges of fraud as to justify a jury in finding fraud in fact.

*Appeal from Mills District Court.*—THOMAS ARTHUR, Judge.

JANUARY 18, 1918.

ON September 2, 1914, the Greigs and Intervener Maynes entered into written contract, by which the first sold and agreed to sell to the last certain described lands, "and appurtenances thereto belonging." This contract was not recorded. The plaintiff bank held a note against the Greigs which was made before said contract was, and, on the day the contract was made, the bank brought suit on its note, and in connection, and on the same day, caused an attachment to be levied on all corn standing in the field on the land sold by and described in said contract. Maynes intervened in this suit brought by plaintiff. The contest is between plaintiff bank and the intervener. Both made motion to have verdict directed. That of intervener was sustained, and plaintiff appeals.—*Reversed.*

*John Y. Stone* and *C. E. Dean,* for appellant.

*Genung & Genung,* for appellee.

SALINGER, J.—I.  The law dispute be-
tween the parties is well outlined in their
respective motions for directed verdict.  In-
tervener asserts that he bought the corn
without any notice that the seller was in-
indebted to anyone, and paid full and adequate considera-
tion therefor.  Plaintiff responds that, when its attach-
ment was levied, it had no notice of the contract aforesaid;
there had been no change of possession of the corn levied
on, and there was nothing to indicate a change in its pos-
session; that, at the time of the levy, the corn was mature
in such sense as to be no longer a part of the realty; and
that, at all events, a separate consideration was paid for
the crop, whereby the parties to the contract had themselves
treated the corn as being separate from the realty sold.

1. ATTACHMENT:
levy, lien,
etc.: prior
unrecorded
sale: notice:
pleading.

II.  The statute, Code, 1897, Section 2906, provides
that:

"No sale or mortgage of personal property, where the
vendor or mortgagor retains actual possession thereof, is
valid against existing creditors or subsequent purchasers,
without notice, unless a written instrument conveying the
same is executed, acknowledged like conveyances of real
estate, and filed for record with the recorder of the county
where the holder of the property resides."

Whatever may be said, were it a matter of the first
impression as to who has the burden on notice, we have
construed this statute to put the burden upon him who re-
lies upon the sale which is not evidenced by such recorded
writing, to show that the creditor had notice.  See *West
v. St. John,* 63 Iowa 287.  The statutes pertaining to the
same subject, in dealing with unrecorded sales of real prop-
erty, do not, on the point in consideration, differ in sub-

stance from said statute dealing with the rights of cred-
itors in personal property.  And as to an unrecorded mort-
gage on lands, we have held that, on the issue whether a
grantee of land had notice of a prior unrecorded mortgage,
the burden of showing such notice is on the one claiming
under the mortgage.  *Walter v. Brown,* 115 Iowa 360.
Though the plaintiff assumed, in pleading, the burden of
proving that it was without notice, in so doing it pleaded
more than it was required to sustain a recovery.  And if,
as appellee contends, the plaintiff failed to prove that it was
without notice, it was but a failure to prove an allegation
which plaintiff was not required to prove in order to main-
tain its case.  The construction we have given this statute is
but an application of the elementary rule that, unless the
statute changes the burden, that whosoever will be defeat-
ed unless his opponent had notice of some given fact has
the burden of proving that the other had such notice; and
the other is not required to prove the negative, and to show
that he was without notice.  True, one who claims to be
an "innocent purchaser" of negotiable paper which could be
defeated for fraud if not sold to such a buyer must prove
the negative, and show that he was without notice.  But
this is so because the statute has been construed to put
that burden upon such claimant.  There is one of our de-
cisions somewhat to the contrary.  But it is dictum only.

*2-a*

2. ATTACHMENT:
proceeding to
procure: al-
legation of
fraudulent *dis-*
posal: ef-
fect as con-
fession of
notice.

Passing this, then, with the final state-
ment that it is immaterial whether or not
plaintiff failed to prove it had no notice, we
reach the contention of the appellee that it
appears in the evidence affirmatively that
plaintiff did have notice.  This is bottomed upon the
claim that a director of the plaintiff, who verified the peti-
tion upon which the attachment was issued, stated in the
affidavit to that petition that the "defendants had dis-

posed of their property with intent to defraud this plaintiff." The appellant responds that this director does not belong to the class who can affect the plaintiff with the knowledge he had. We cannot agree to that position, and hold that whatsoever this director knew was the knowledge of the plaintiff. The question remains, What does the proof show he knew of the sale which is the subject of this controversy?

3. CORPORATIONS: representation by officers: attachment: knowledge of directors.

The statute declares that an honest sale of personal property, where possession is retained by the vendor, is not effective against existing creditors unless written evidence of such sale be duly recorded. But the creditor cannot attack an honest sale for want of record until after he has made a seizure of the property claimed to have been sold. In the very nature of things, he cannot always wait for execution, and must sometimes proceed by attachment. One ground for obtaining a writ of attachment is an allegation that the defendant has disposed of his property with intent to defraud creditors. If the view of the appellee is to prevail, the sale cannot be effectively avoided without seizure; the seizure may be by attachment; the attachment cannot be had without making said allegation; but, if the allegation is made, the seizure under the writ is of no avail, because the authorized means of getting the seizure defeat the seizure, on the ground that the attachment creditor had notice before he seized. Of course, we do not intend to hold that notice which would defeat the creditor might not be proved by what is found in his petition. What we do hold is that, where a levy by attachment is the basis of asserting want of writing and record, the attaching creditor is not affected with notice of the particular sale which should have been, and was not, evidenced of record, by the naked fact that, in the petition which got him his lien, and to get it, he

made the general statement that the defendant had disposed of some undescribed property to some unnamed grantee, with intent to defraud creditors.

2-b

The intervener's motion to direct, which was sustained, did not raise the question whether the plaintiff's levy must fail because he had not attached the land, but had made a levy upon the crop of corn standing on the land as though it were personal property, when it appears, as matter of law, it was not fully matured, and was, therefore, part of the land, and not affected by a seizure as personal property.

We have to say that, if the motion *had* been bottomed upon or *had* included such claim, it would still have been error to direct verdict for the intervener on that ground, because, at the least, it was a question for the jury whether the crop was or was not a part of the realty. We are not determining at this time whether, as matter of law, the corn crop was or was not mature, but merely hold that the intervener did not ask a directed verdict on that ground; that his motion was not sustained on that ground; and that, if this were not so, a motion on that ground should have been overruled, because it is not made to appear as matter of law that the crop had not fully matured at the time the plaintiffs seized it as personal property.

III. But all that has been said deals only with honest sales, and does not stand in the way of the plaintiff if it may fairly be said there was enough evidence to send to the jury the claim that the transfer was covinous, and made with intent to hinder and delay the creditors of the seller.

4. FRAUDULENT CONVEYANCES: evidence: unusual nature of conveyances.

On and before September 2, 1914, the defendants had title to a quarter section of land in Mills County. In an agreement made between them and the intervener, Maynes,

on that day, it is recited that the sole incumbrance is one
mortgage of $17,000, and that the sale to intervener is
made for $25,600. The jury could find that this was sub-
stantially all the property the defendants then had; and
that, upon sale of this land and the crops thereon, the
defendants became insolvent; or that, at any rate, there
was no intention to save any of the purchase price for the
purpose of paying the debt owing the plaintiff.

Though the contract expressly recites there is no in-
cumbrance except a mortgage for $17,000, and to one Dur-
bin, intervener testifies that he found the mother of the
sellers had a mortgage for $5,000. He expresses no sur-
prise at this discovery, and says that he was to pay the
mother $4,500 therefor. He testifies he made payment be-
fore the contract was drawn. It appears he did so by
checks made payable to both the mother and to one of
the sellers, her son. He claims that the mother, there-
upon, at once delivered him the mortgage and a release
thereof, and that he filed the release for record at once.
If this is so, the release was made on September 2, 1914.
The record shows that it bears date June 16, 1915. The con-
tract written up after the mother was paid provides that
the seller shall furnish an abstract for inspection and ap-
proval, and that, if it does not meet with approval, it
shall be returned for correction; but the payment to the
mother was made, as said, before the contract was drawn,
and without the examination of an abstract. There
was so little care given to the contract that intervener
says he does not know whether he therein assumed payment
of the mother's mortgage or not,—which, in a sense at
least, overlooks that payment had been made before there
was any contract in which an assumption could be made.

The contract is silent on the sale of a corn crop. The
testimony shows that a lumping deal was made both as
to the land and the crop thereon. While there is a state-

ment that $1,350 was agreed on as the price for the crop, intervener testifies that, included in the payment which the contract recites was "cash in hand," was payment for livestock sold Greig in the past; that intervener does not know the amount, except that there was owing $66 for a cow, and something like $100 for two others. The purchase price is "lumped off" by saying that it includes these things and boot money for past horse trades, amount not known or stated; that it includes $850 for interest due on the first mortgage, when only half had accrued, and the sellers were only to pay half; which is accounted for by a statement of the intervener that, though these were to pay only half, he made them pay it all. The testimony of Greig is as loose, and he concludes with the statement that intervener and he traded quite a bit together, and when they made this deal, "we kind of estimated it all up and settled that way. And I turned over the crop to settle this account." Both witnesses profess to have settled according to account books that they did not have with them, and which they did not produce. There are other contradictions that it is not necessary to set out. Neither witness testified that the mutual transfers were good-faith transactions. There is no showing attempted as to what the land and the corn crop were worth, and whether what is claimed to have been paid for it is an adequate consideration.

When the buyer and seller found, very shortly after they had signed the contract and transferred a livery establishment to Greig, that the corn crop had been attached, neither expressed any surprise or made any protest.

The contract recites that something over $8,000 was "cash in hand." The evidence discloses that the only cash paid was $4,500 to the mother, for a mortgage not disclosed in the contract of sale. The bulk of what was paid by intervener in addition, was the transfer of his livery stable

and contents to Greig. That was effected with the utmost promptness and finality, almost immediately after the contract was signed, and before any abstract had been furnished of the title to the land. The transfer of that was deferred for some 3½ months. It was not finally effected until about 5½ months. There is nothing to indicate that the intervener intended to take immediate possession of the corn crop, and the jury could find that the delay in transferring the land, as compared with the speed in transferring the livery establishment, was for the purpose of allowing the seller to retain the corn crop claimed to have been sold in whole or in part. Nothing indicates that the intervener was a farmer, or that the buyer, who had been a farmer, had any experience in being a liveryman, or had ever before thought of engaging in that business. All that does appear is that an immediate and irrevocable transfer of the livery stable was made instantly. There is no evidence as to what the livery property was really worth, except that, if one witness was believed, though it was taken in at $4,500, it was not worth $2,500. In dealing with this, there was the same looseness: neither buyer nor seller are in position to say with any kind of exactness how many horses or buggies or carriages there were; and the seller does not even pretend to say how many lots the barn stood on. He says, "I don't know how many lots there were,— the railroad cut it up; they were pieces of lots."

According to intervener, the negotiations for this entire transfer, both farm, crop, and livery establishment, were begun on the day before the contract was signed, and, therefore, a day before the corn crop was attached. One of the sellers, however, testifies that he talked with intervener, about a week before the contract was signed, "with reference to the sale of the land," and that an agreement was reached out on the farm, and on the morning of September 2d.

On this record, the jury was bound to find that many "badges of fraud" exist. It could find that there were still others. Such badges do not necessarily indicate criminality. They may appear though, if the truth were known, the parties to a sale had no actual intent to cheat anyone. The jury may find the transaction to be valid as against creditors, in spite of the badges. The fact remains that the law authorizes the trier of facts to treat such badges as being presumptive evidence of legal fraud, such as will invalidate a transfer against existing creditors. If this statement seems to be in any sense self-contradicting, the contradiction is reconciled by understanding that the law recognizes that those who commit frauds make it as difficult as possible to prove that fact; that this compels fixing some arbitrary standard to judge by; and that, therefore, it may be found as a fact from badges of fraud that fraud exists, though, abstractly speaking, if all that might be known were known, it would be found there was no fraud. This is another way of saying that a jury may find fraud in a transfer from circumstantial evidence.

We are of opinion that the alleged fraud was a question for the jury. We are constrained to reverse because the court held that as matter of law no fraud was shown.— *Reversed.*

PRESTON, C. J., LADD, EVANS, and GAYNOR, JJ., concur.